IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

E.N                                    NO. 1:09-CV-1727

v.                                     JUDGE CONNOR

SUSQUEHANNA TOWNSHIP          MAGISTRATE JUDGE METHVIN
    SCHOOL DISTRICT
JAMES FRANK
NANCY FRANK
KERMIT LEITNER
DAVID W. VOLKMAN
SANDIE L. PENSIERO
RANDY BRENNER
JUDY BAUMGARDNER

REPORT AND RECOMMENDATION
ON MOTION FOR SUMMARY JUDGMENT
(Doc. 76)

This suit arises from allegations that a male high school teacher sexually

assaulted "E.N.," a sixteen-year-old female student, during a driving lesson.[1]

Plaintiff, a former student of Susquehanna Township High School, brings this

action against the teacher, James Frank; the Susquehanna Township School

District; Superintendent David W. Volkman; former principal Kermit Leitner;

current principal Judy Baumgardner; guidance counselors Sandie L. Pensiero and

Randy Brenner; and Nancy Frank, a substitute teacher and wife of defendant

James Frank.

---

[1] The court refers to the plaintiff by her initials, E.N., due to the sensitive nature of the
claims and because plaintiff was a minor at the time of the alleged assault. *See* L.R.
5.2(d)(2).

2

Plaintiff's complaint includes constitutional claims under 42 U.S.C. §1983 (*Counts I-III*); claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a) (*Counts IV-VI*); state law claims for intentional infliction of emotional distress (*Count VII*); assault and battery (*Count VIII*); tort claims against the School District under the doctrine of *respondeat superior* (*Count IX*); claims under the Pennsylvania constitution (*Count X*); and a claim for punitive damages (*Count XI*).

Defendants' previously filed a motion to dismiss.[2] In a 50-page memorandum ruling signed November 23, 2010, the motion was granted in part and denied in part.[3]  The surviving claims are:

Counts I and II:   Defendants Frank, Leitner, Volkman and the school district violated plaintiff's right to bodily integrity and personal security under the Fourteenth Amendment.

---

[2] Doc. 19.

[3] Doc. 62.  The court dismissed the following claims: all Fourth Amendment claims in Counts I and II; claims against Pensiero and Brenner in Count II; right to privacy claims (Claim III) against all defendants except Pensiero; and plaintiff's Title IX education rights claim (Count V) as to all defendants. The Order also dismissed the Title IX retaliation claim (Count VI) against all defendant except the school district; dismissed the intentional infliction of emotional distress claim (Count VII) against all defendant except Frank; dismissed the respondent superior claim (Count IX) against the school district and dismissed the state constitutional claims (Count X) against all defendants.  Additionally, plaintiff's punitive damages claim survives only against the individual defendants in their individual capacities.

3

| Count III: | Plaintiff's right to privacy under the Fourteenth Amendment was violated by Pensiero. |
|---|---|
| Count IV: | The school district maintained a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681; |
| Count VI: | The school district retaliated against plaintiff for reporting the sexual harassment in violation of Title IX and the First Amendment; |
| Cts VII and VIII: | State law claims for intentional infliction of emotional distress, assault and battery against Frank. |
| Count XI: | Punitive damage claim against the individual defendants in their individual capacities. |

Before the court is defendants' motion for summary judgment.[4] The motion has been referred to the undersigned for a report and recommendation, and is now ripe for disposition.[5] For the following reasons, it is recommended that the motion for summary judgment be denied, with the exception of Count III (§1983 Right to Privacy).

---

[4] Doc. 76.

[5] Defendants filed their motion on February 11, 2011 along with a statement of material facts and a supporting brief (Docs 76, 77, 78). Plaintiff filed a brief in opposition and a response to the motion on April 6, 2011 (Doc. 87, 88). Defendants filed a reply brief on May 6, 2011 (Doc. 106). Judge Connor referred the pending motion for summary judgment to undersigned on May 9, 2011 (Doc. 107).

4

## ISSUES PRESENTED

Defendants raise the following issues on summary judgment:[6]

1.   Has plaintiff demonstrated both that there was a custom, practice or policy by the school district that played an affirmative role in her assault, and that the defendants were deliberately indifferent to such an assault, so as to subject defendants to liability under §1983?

2.   Are defendants Leitner and Volkman entitled to qualified immunity on the claims asserted against them?

3.   Has plaintiff established facts to support a right to privacy claim under the Fourteenth Amendment against Pensiero?

4.   Are there facts to establish that the school district maintained a hostile educational environment in violation of Title IX?

5.   Has plaintiff put forth sufficient facts to establish a claim of retaliation under Title IX?

6.   Is plaintiff entitled to punitive damages on her claims?

## FINDINGS AND RECOMMENDATIONS

### I. Background [7]

Viewing the facts in a light most favorable to plaintiff reveals the following:

E.N. was a student at Susquehanna Township High School from 2004 to 2008.

---

[6]  The motion for summary judgment sub judice does not challenge certain counts against James Frank, to wit: Counts I (§1983), VII (assault) or VIII (battery).

[7]  In the memorandum ruling on the motion to dismiss, Judge Conner set forth in detail the allegations of plaintiff's complaint. This summary is provided to facilitate an understanding of the analysis and recommendations made herein.

5

The school provided behind-the-wheel ("BTW") driver education. The instructor was defendant James Frank, a long-time teacher at the school. The lessons were to be taught with at least two students at all times. Private lessons violated an express policy of the school district, which provides: "at no time will a driver education teacher instruct one student in the car. Two or more students will be scheduled during each driving period." Principal Kermit Leitner, superintendent David W. Volkman, and former principal Mark Galowitz[4] were aware that Frank provided individualized lessons in violation of this policy, having each observed Frank with only one student.

In the spring of 2006, E.N. signed up to take BTW lessons. E.N. had three driving lessons with Frank. The third driving lesson occurred on March 8, 2006. During this lesson, Frank directed E.N. to park near a wooded area and to follow him into the woods. E.N. complied. Once in the woods, Frank unbuttoned his pants. Frank pushed E.N. to her knees and forced her to perform oral sex. When it was over, Frank indicated that he thought plaintiff was ready to get her license.

Approximately two months later, on May 7, 2006, E.N. informed her English teacher that she had been sexually assaulted. On the advice of the teacher, E.N. notified two guidance counselors – defendants Sandie L. Pensiero and Randy

---

[4] Galowitz is not named as a defendant.

Brenner – about the sexual assault, but she did not disclose the identity of the person who had assaulted her. Pensiero and Brenner were initially supportive. When E.N. named Frank as the man who had assaulted her, Pensiero and Brenner tried to persuade E.N. to change her story. Pensiero thereafter discussed the assault with Diane Caruso, the mother of E.N.'s then-boyfriend.

Although the school district suspended Frank in May of 2006 as a result of the allegations, many of the school administrators, teachers, and students openly supported Frank. On July 20, 2006, Principal Leitner sent a letter to school district employees soliciting money for Frank's defense fund. After he retired from the school district, Leitner sent a second letter to district employees in February 2007, expressing his belief that Frank's accuser was not telling the truth and that he "could have minimally gotten her to change her story (again) or recant it altogether" but that he had been denied the opportunity to interrogate her. Neither letter specifically mentioned E.N. by name or provided any details of the alleged assault. Additionally, in a class attended by E.N., teacher Christine Jordan displayed on an overhead projector a Leitner letter soliciting money in support of Frank. Students wore tee-shirts that read "FREE JF" in a senior class photo. Frank's wife, Nancy Frank, was a substitute teacher in the school district. On

multiple occasions, the school district assigned Mrs. Frank to substitute-teach E.N.'s classes.

Following his acquittal at a criminal jury trial on the allegations in the summer of 2007, Frank was reinstated in 2007. However, the school district made no effort to restrict Frank's contact with E.N. E.N. and her parents notified the new principal, defendant Judy Baumgardner, of E.N.'s extreme discomfort. Despite their entreaties, Baumgardner simply excused E.N. from certain attendance requirements, and burdened E.N. with the decision to escape those situations she found stressful. Because of her constant distress on campus, E.N. completed the requirements of her senior year in homebound instruction.

E.N. maintains that the circumstances of her homebound instruction were also a source of humiliation and embarrassment. The school district conducted tutoring at a public library, and E.N.'s plight was on display to the general public. E.N. also avers that the homebound instruction did not provide the same quality of instruction, depriving her of educational opportunities available to other students.

E.N. alleges that the school administration failed to investigate her allegations, to make findings, or to discipline Frank. E.N. states the administration knew of past misconduct by Frank but failed to address or correct it. Three administrators – Leitner, Volkman, and former principal Mark Galowitz –

admitted being aware of Frank's individual lessons in contravention of district policy. While Frank was told to discontinue the individual lessons, no steps were taken to ensure his adherence to the policy.

Plaintiff asserts there was at least one specific instance of inappropriate sexual behavior by Frank in the school context prior to the alleged sexual assault. Frank was reported to have approached a female student at a school dance during the 1999-2000 school year and asked to see her nipple piercing ("Devore incident"). This student filed a complaint with the school, which conducted an informal investigation. After Frank issued an apology, the matter was not pursued further. E.N. avers that the school district never disciplined Frank for any of this offensive conduct. The present action followed.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

9

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine dispute of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid or obtain summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed. R. Civ. P. 56(c)(1); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (requiring evidentiary support for factual assertions made in response to summary

judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed. R. Civ. P. 56(e).

## III. Discussion

*(A) Section 1983 (Count II)*

Defendants contend that plaintiffs have failed to establish entitlement to relief under 42 U.S.C. §1983, which provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

<u>Id.</u> Section 1983 imposes civil liability upon any person who, under color of state law, deprives someone of the rights, privileges, or immunities secured by the federal Constitution or the laws of the United States. *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000). Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To establish a Section 1983 claim, therefore, a plaintiff "must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation [violation of a right] was committed by a person acting under the color of state law." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

Municipalities maybe sued under §1983, with some limitations. "A public entity . . . may be held liable for the violation of a constitutional right under 42 U.S.C. §1983 only when the alleged unconstitutional action executes or implements policy or a decision officially adopted or promulgated by those whose acts may fairly be said to represent official policy." *Reitz v. Bucks County*, 125 F.3d 139, 144 (3d Cir. 1997) (citing *Monell v. New York City Dep't of Social Svcs.*, 436 U.S. 658, 690-91 (1978)). "A policy is an official proclamation or edict of a municipality, while a custom is a practice that is 'so permanent and well-settled as to virtually constitute law.'" *Crouse v. South Lebanon Twp.*, 668 F. Supp. 2d 664,

12

675 (M.D. Pa. 2009) (Conner, J.) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (quoting, in turn, *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted)). However, "[a] custom need not be 'formally approved by an appropriate decision-maker,' but must be 'so widespread as to have the force of law.'" *Id.* at 675-76 (quoting *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (quoting, in turn, *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997)). Respondeat superior liability, based solely on the acts of employees, in unavailable. *Monell*, *supra* at 691.

A school district is a municipality for the purposes of a §1983 claim. *See* 53 Pa.C.S.A. § 7101 (defining "municipality" to include school districts); *Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir.2006) (analyzing a school district's liability as a municipality). It is insufficient for §1983 liability to demonstrate that the school district employed the wrongdoer. *Monell*, 436 U.S. at 691. Rather, to hold a school district liable, a plaintiff must establish that: (1) a school district's policy, practice, or custom played an affirmative role in bringing about his alleged injury; and (2) the school district acted with deliberate indifference. *Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 176 (3d Cir.2001).

13

Count II of the complaint alleges that Leitner, Volkman and the school district violated plaintiff's 14th Amendment right to bodily integrity, which encompasses freedom from sexual abuse. To succeed on this claim, plaintiff must show that the district established and maintained a custom or policy that affirmatively contributed to her assault. *See id.* She must also identify a supervisory official or final policymaker of the school district who had actual knowledge of similar conduct in the past and acted with deliberate indifference in response thereto. *See id.*

### 1. Custom or policy

There are three scenarios in which a school district employee's actions are deemed to result from a policy or custom that subjects the school district to §1983 liability: (1) when an officer or entity officially promulgates a policy statement, and the employee's act is an implementation of that policy; (2) when the act of the policymaker violates federal law; and (3) when a policymaker fails to act affirmatively, despite the obvious need for action to control its agents. *Natale*, *supra*. The third scenario is applicable to the facts of the instant case.

### a. Failure to properly address violations

Defendants argue that there was no custom or policy upon which to premise §1983 liability. First, they assert that there was not a custom or policy of

inadequate training. They argue that the persons likely to receive complaints of harassment were properly trained in how to handle such allegations. Defendants also aver that there was not a custom or policy of downplaying reports of harassment. Rather, they contend that they investigated and dealt with all incidents reported to the administration. Defendants further dispute the contention that there was a custom or policy of suppressing specific complaints of harassment against Frank. While acknowledging several complaints were received about the harassing behavior of Frank, defendants maintain that all but one of these were made after the plaintiff came forward with her allegations. The defendants also assert that there was no policy or custom of allowing Frank to take student out for lessons individually, in violation of the BTW policy. In support of this argument, defendants state that no one in the administration gave Frank permission to take students out individually and, on the occasions when he was observed with only one student, he was warned to discontinue the practice.

However, as plaintiff points out, defendants neither conducted formal investigations nor made records of complaints or their findings, as demonstrated by the Devore incident. Such actions or inactions could be interpreted as minimizing the significance or importance of complaints of sexual harassment or sexual abuse. Additionally, although Frank was observed on at least three

occasions giving driving lessons with only one student in the car, a violation of the BTW policy, he was merely told to desist such actions. Of course, this conduct continued in spite of the warnings. Had a formal reprimand or correction been given, or had school authorities followed-up to ensure compliance with the BTW policy, such behavior may have stopped and plaintiff's assault arguably could not have occurred. Such a lackadaisical approach could been viewed as a custom or policy where defendants failed to act despite the need to do so to correct Frank's conduct. Moreover, a reasonable person could conclude that the actual cause of plaintiff's assault was the school district's failure to afford the appropriate gravity and formality to complaints of sexual harassment as well as its failure to enforce the BTW policy.

### b.  Failure to train

Plaintiff also asserts that the school district failed to properly train its employees to recognize and report signs of sexual abuse. "[I]n the absence of an unconstitutional policy, a [school district's] failure to properly train its employees [] can create an actionable violation of a party's constitutional rights under §1983." *Reitz*, *supra* at 145 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Failure to train can be the basis for liability if the failure to train reflects a deliberate or conscious choice by the school district. *See City of Canton*, 489 U.S.

16

at 389. In order for liability to attach, plaintiff must show that deficiency in the training program is closely related to her assault. *See id.* at 391. It is not enough to prove that an injury could have been avoided if a school official had better or more training. *See id.*

"Establishing municipal liability on a failure to train claim under §1983 is difficult." *Reitz*, 125 F.3d at 145. Generally, deficient training can only amount to the requisite deliberate indifference "where the failure to train has caused a pattern of violations." *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir.2000). An exception exists, however, and a "failure to train" claim under *Monell* may proceed absent a pattern of violations where (1) "a violation of federal rights may be a highly predictable consequence of a failure to equip [school officials] with specific tools [or skills] to handle recurrent situations," and (2) the likelihood of recurrence and predictability of the violation of a citizen's rights "could justify a finding that [the] policymakers' decision not to train an officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice-namely, a violation of a specific constitutional or statutory right." *Kline ex rel. Arndt v. Mansfiled*, 255 F. App'x. 524, 629 (3d Cir. 2007)(quoting *Brown*, 520 U.S. at 409).

Plaintiff argues that the school district did not maintain an appropriate policy on sexual harassment and sexual assault, and that school officials were not properly trained to handle such complaints. She further alleges that Volkman, as both superintendent and Title IX coordinator, lacked specialized training in handling claims of sexual harassment. She maintains that the improper training, evidenced by the lack of formal investigations and record-keeping, led to her assault.

The first theory of liability under §1983 on a failure to train theory requires plaintiff to show a pattern of violations. Defendants argue that the majority of allegations regarding Frank sexual harassment were brought to the attention of school officials after plaintiff's allegations were made. Although the majority of complaints against Frank were not known to school officials prior to plaintiff's assault, the Devore incident and Frank's multiple violations of the BTW policy were known to them. As noted above, these instances demonstrate that there were circumstances putting defendants on notice of pattern of violations by Frank.

Moreover, although the school district had a sexual harassment policy in place, it is questionable whether there was adherence to procedures for reporting and investigating complaints or if such procedures were adequate to address claims of sexual harassment. Deliberate indifference might be inferred from

inaction following a complaint of harassment. *K.P. v. Corsey*, 228 F. Supp.2d 547, 551 (D.N.J.2002), *rev'd on other grounds*, 77 F. App'x. 611 (3d Cir. 2003). The school district's alleged failure to train employees to handle sexual harassment claims by conducting a formal investigation and documenting such complaints could make the violation of one's federal rights a highly foreseeable outcome. Failing to formally investigate and make a record of sexual assault complaints could be arguably be viewed as increasing the likelihood that sexual harassment would go unchecked and possibly become recurrent and predictable so as to suggest that a failure to train reflects deliberate indifference.

Considering the foregoing, defendants have failed to show that there is not genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law on the failure-to-train issue. Accordingly, it is recommended that summary judgment be denied on plaintiff's failure to train claim.

2. *Are defendants policymakers?*

Liability under §1983 must stem from policy making authority. Only an individual with final decision-making authority can make official policy on behalf of the school district. *See Pembauer v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986). "[I]n order to ascertain who is a policy maker a court must determine

which official has final, unreviewable discretion to make a decision or take

action." *Kneipp*, *supra* at 1213. Whether a person has final decisionmaking

authority is a question of state law. *McGreevy v. Stroup*, 413 F.3d 359, 368 (3d

Cir. 2005); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989); *City of St. Louis*

*v. Praprotnik*, 485 U.S. 112 (1988). A single decision by an individual with policy

making authority may be sufficient to impose liability on the school district. *See*

*Pembaur*, 475 U.S. at 480 (stating that "it is plain that municipal liability may be

imposed for a single decision by municipal policymakers under appropriate

circumstances"); *McGreevy*, 413 F.3d at 367-68. However, not every decision by

an officer subjects a school district to liability. "[School district] liability under

§1983 attaches where – and only where – a deliberate choice to follow a course of

action is made from among various alternatives by the official or officials

responsible for establishing final policy with respect to the subject matter in

question." *Pembaur*, 475 U.S. at 483. If an employee's action is subject to

discretionary review, the employee is not a final policymaker under §1983.

*Brennan v. Norton*, 350 F.3d 399, 428 (3d Cir. 2003).

The final policy maker for a school district in Pennsylvania is typically the

school board or the superintendent. *See* 24 Pa. C.S.A. §§ 5–508, 5–510, 5–514,

10–1081 (superintendent duties); *McGreevy*, 413 F.3d at 369. In the instant matter,

therefore, Volkman, as superintendent, clearly qualifies as a policymaker.

Defendants argue that Leitner, as principal of the high school, is not a

policymaker, claiming he lacked final, unreviewable discretion to make decisions.

However, defendants concede that Leitner played a role in developing some

district policies. He testified, for instance, that he revised the student and faculty

handbooks. Consequently, there is evidence upon which a reasonable person could

conclude that Leitner was a policymaker. Given the existence of a disputed

material fact, summary judgment in favor of the defendants is not warranted on

this issue.

   *3.  Actual knowledge and deliberate indifference*

   As noted above, both Volkman and Leitner had knowledge of Frank's BTW

policy violations. Additionally, it would be difficult to conceive that, given their

positions in the school district, they failed to have knowledge of the Devore

incident. The lack of formal investigation, reporting or recording of the Devore

incident, coupled with the multiple incidents where Frank was observed violating

the BTW policy by various school officials, for which no formal corrective or

disciplinary action was taken, could be viewed by a reasonable person deliberate

indifference by school officials. Based on this, a fact-finder could conclude that

the defendants had knowledge of misconduct and elected to take no measures to

deter such behavior. Defendants have not established that there is no genuine issue

of material fact and that they are entitled to judgment as a matter of law.

Accordingly, plaintiff has established her claim for liability against defendants

under §1983 for purposes of a summary judgment motion.

*(B) Qualified Immunity*

Government officials, performing discretionary functions, are entitled to qualified immunity for their actions, if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is an affirmative defense that the defendant must raise. *See Siegert v. Gilley*, 500 U.S. 226, 231 (1991). It is the defendants' burden to establish that they are entitled to qualified immunity. *Ryan v. Burlington County*, 860 F.2d 1199, 1204 n. 9 (3d Cir.1988), *cert. denied*, 490 U.S. 1020  (1989). Because the Supreme Court characterizes the issue of qualified immunity as a question of law, *Elder v. Holloway*, 510 U.S. 510, 511 (1994), the resolution of immunity questions early in the proceedings is encouraged. *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001); *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

There are two inquiries that a court must make in determining whether a defendant is entitled to qualified immunity. One is whether the facts as alleged in the complaint make out a violation of a constitutional right. *Saucier v. Katz*, 533 U.S. at 201. The second question is whether "the right was clearly established . . . in light of the specific context of the case." *Id.* Qualified immunity serves as a shield from suit if a defendant official could have reasonably believed that the

23

actions in question were lawful in light of clearly established law and the information the defendant possessed at the time. *Hunter v. Bryant*, 502 U.S. at 227 (quoting *Anderson*, 483 U.S. at 641). Officials who "reasonably but mistakenly" conclude that their actions were lawful are still entitled to immunity. *Id.* This standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 229 (citing *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). However, the reasonableness of defendants' actions is measured by an objective standard; arguments that the defendants desired to handle or subjectively believed that they had handled the incidents properly are irrelevant. *Anderson*, *supra.*

In this case, the constitutional right to freedom from invasion of one's personal security through sexual abuse, is well-established. *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 726 (3d Cir. 1989). Although plaintiff does not allege that either Volkman or Leitner participated in the assault, liability may attach to these defendants, as well as to the school district, in their supervisory capacity. For these defendants to be held liable for the actions of their subordinates requires plaintiff to demonstrate that they participated in the unconstitutional action, directed the action or, as supervisors, had knowledge and acquiesced in the subordinate's violation. *See C.N. v. Ridgewood Bd. of Educ.*, 430

24

F.3d 159, 173 (3d Cir.2005) (discussing the §1983 liability of a school board and individual defendants in context of alleged privacy and speech violations); *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir.2004) (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d. Cir.1995). Officials in administrative positions may be liable for actions that encourage, support, or condone the assaultive behavior of subordinates. *Stoneking*, 882 F.2d at 729; id. at 729-30) (citing and discussing *Commonwealth v. Porter*, 659 F.2d 306 (3d Cir.1981) and *Black v. Stephens*, 662 F.2d 181 (3d Cir.1981). An affirmative action is required – inaction and insensitivity alone are insufficient. *Stoneking*, 882 F.2d at 730-31 (citing *Rizzo v. Goode*, 423 U.S. 362 (1976)).

Therefore, in order for plaintiff to establish this claim, she must show (1) a supervisory practice defendants failed to employ; (2) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents; (3) circumstances where the defendants' inaction could be found to communicate a message of approval; and (4) proximate cause between her injury and the defendants' action or inaction. *Brown v. Muhlenberg Tp.*, 269 F.3d 205, 216 (3d Cir.2001); *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir.1997). Plaintiff alleges that the defendants failed to properly supervise Frank and that they were

aware of misconduct by him and failed to remedy it. Such circumstances, plaintiff avers, communicate approval of Frank's behavior.

To support her contention that defendants are not entitled to qualified immunity, plaintiff points to both Frank's violations of the BTW policy on three occasions as well as to the Devore[5] incident. She further states that no corrective measures or disciplinary action was taken on these occurrences.

Volkman and Leitner stated that they each observed Frank violate the BTW policy on one occasion, and both instructed him not to let it happen again. They both maintain that there was no communication of other violations, so each knew only of the one violation he observed. However, despite this lack of communication, Volkman and Leitner cannot escape liability based on their professed ignorance of the occurrences happening at the place they are tasked with leading. Any other result would encourage a practice of not communicating such matters as a shield to liability. Moreover, despite correcting Frank in his BTW violations, the verbal warning each gave clearly was insufficient to deter such action as evidenced by the same misconduct being repeated by him. Plaintiff has thus established that both Volkman and Leitner failed to adequately supervise

---

[5]  Throughout their pleadings, defendants refer to the Devore incident as "unfounded," which is a questionable assessment inasmuch as they concede no formal investigation occurred as to the facts of that alleged incident.

Frank and that they had knowledge of past incidents involving similar misconduct. Their failure to correct such behavior or take any steps to prevent its reoccurrence could suggest that they condoned his actions. Further, plaintiff has alleged sufficient facts to establish that the defendants inaction was a proximate cause of her assault.

Moreover, although Volkman and Leitner profess to have no knowledge of the Devore incident, it was investigated by Galowitz and Wilson who, in turn, were supervised by Volkman and Leitner. After it was reported, Frank issued an apology to Devore. School officials instructed Devore that she could pursue the matter with the school board if she was unsatisfied with that resolution. Whether knowledge of the Devore incident can be imputed to Volkman and Leitner is a factual determination. Likewise, whether the failure to communicate such allegations to supervisors or to maintain records of such an incident indicates a supervisory practice that the defendants failed to employ also requires factual determination incapable of resolution in a motion for summary judgment. Given the existence of a material factual dispute, summary judgment is not warranted.

*(C) Right to Privacy (Count III)*

In Count III, plaintiff alleged that her Fourteenth Amendment right to privacy had been violated when the school district and several individual

defendants released information about the sexual assault complaint to members of the public. This court previously dismissed Count III as to all defendants with the exception of guidance counselor Sandie Pensiero.[6] As to Pensiero, the court wrote:

> The complaint cryptically alleges that Pensiero disclosed to a third person "confidential matters and intimate facts concerning E.N. that E.N. had disclosed to her in confidence." (Doc.1 ¶ 86). It does not identify the nature of these "confidential matters," and it is unclear whether Pensiero specifically disclosed E.N.'s identity. Nevertheless, the complaint sufficiently places Pensiero on notice of the particular conversation alleged at issue, and therefore, the court will not dismiss the claim against Pensiero at this juncture.[7]

The relevant allegations of plaintiff's complaint allege that on the advice of an English teacher, she "provided the guidance counselors, Defendants Brenner and Pensiero, with confidential information regarding the assault;" that Pensiero later disclosed to Diane Caruso, the mother of another student, "confidential matters and intimate facts concerning E.N. that E.N. had disclosed to her in confidence."[8]

Defendants contend that plaintiff had no reasonable expectation of privacy in the information Pensiero discussed with Caruso, and was not harmed, because

---

[6] Doc. 62, pp. 25-30.

[7] *Id.* at 29.

[8] Doc. 1, ¶¶ 77-86.

28

E.N. herself had previously discussed the assault with Mrs. Caruso, who was her boyfriend's mother. Defendants also contend that the discussion with Caruso was not made public, but kept to a private conversation between individuals. Defendants acknowledge that school officials reprimanded Pensiero for violating E.N.'s confidentiality rights, but contend that this set of facts cannot support a constitutional claim for violation of privacy rights.

In response, plaintiff concedes that she had previously told Caruso about the assault, and that it was Caruso who then approached Pensiero "to discuss E.N.":[9]

> When Mrs. Caruso first approached Pensiero to discuss E.N., Pensiero first advised her that she could not discuss anything about E.N.'s case, and then she proceeded to talk to Mrs. Caruso about E.N.'s case for forty-five (45) minutes. . . At the conclusion of the conversation, Pensiero asked Mrs. Caruso to keep the conversation a secret because she should not have talked to Mrs. Caruso about E.N. . . . Baumgardner, Leitner and Volkman all admitted that Pensiero breached her duty of confidentiality to E.N. by divulging confidential information about E.N. to Mrs. Caruso and Pensiero was reprimanded for her violation.[10]

"[T]he Constitution embodies a promise that a certain private sphere of individual liberty will be kept largely beyond the reach of government." *Thornburgh v. American College of Obstetricians*, 476 U.S. 747, 772 (1986). This

---

[9] Plaintiff's Brief in Opposition to Motion, Doc. 88 at pp. 18-19.

[10] *Id*.

constitutional right to privacy extends to "the individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*, *supra* at 599; *Trade Waste Management Ass'n, Inc. v. Hughey*, 780 F.2d 221, 223 (3d Cir.1985); *see also* Kurland, *The Private I*, The University of Chicago Magazine 7, 8 (Autumn 1976) ("The concept of a constitutional right of privacy [includes] the right of an individual not to have his private affairs made public by the government."). Courts have held that [disclosures to school counselors and] are clearly within this constitutionally protected sphere.

One of the types of privacy interests protected "is the individual interest in avoiding disclosure of personal matters[.]" *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000); *C.N.*, *supra*, at 1197 ("[T]he right not to have intimate facts concerning one's life disclosed without one's consent" is "a venerable [right] whose constitutional significance we have recognized in the past.") (citations omitted). The central inquiry is whether the information is "within an individual's reasonable expectations of confidentiality." *C.N.* 430 F.3d at 178 (quoting *Fraternal Order of Police v. City of Philadelphia*, 812 F.2d 105, 112 (3d. Cir.1987) (quotations omitted). The more intimate and personal the information, the more justified the expectation that the information will not be publically disclosed. *Id.*

In order to decide whether an intrusion into an individual's privacy is justified, the court "must engage in the delicate task of weighing competing interests." *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 578 (3d Cir.1980). In conducting this balancing test, the following factors should be considered: "the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access." *Id.*

None of the balancing factors of *Westinghouse* favor disclosure of the information plaintiff had confided in her counselor. Pensiero had no basis to discuss the matter with any individual, such as Mrs. Caruso, who was outside of what would be a reasonable person's scope of privacy.  However, BLACK'S LAW DICTIONARY (9th ed. 2009) defines "disclosure" as "[t]he act or process of making known something that was previously unknown; a revelation of facts." Plaintiff has not identified any information that Pensiero divulged to Mrs. Caruso of which she had been previously unaware. Rather, the right to privacy claim is premised upon the theory that plaintiff had a reasonable expectation that such matters would

be kept confidential. This is undisputed. However, despite the fact that Pensiero

lacked plaintiff's consent to discuss the matter with another, the fact that Mrs.

Caruso already had knowledge of the facts and claims from plaintiff herself before

speaking with Pensiero undermines a claim that her privacy was breached.

Inasmuch as plaintiff herself disclosed the matter to Mrs. Caruso, no violation of

her right to privacy has occurred.[11] Accordingly, there is no genuine issue of

material fact with respect to this issue and Pensiero is entitled to judgment as a

matter of law. Consequently, summary judgment in favor of Pensiero is

recommended as to Count III.

 *(D) Title IX – Sexual Harassment (Count IV)*

Title IX provides that "[n]o person ... shall, on the basis of sex, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination

under any education program or activity receiving Federal financial assistance."

20 U.S.C. § 1681(a). Although the statute's "express means of enforcement" is

limited to action "by administrative agencies," the Supreme Court has found an

implied private right of action for monetary damages. *Dawn L. v. Greater

Johnstown Sch. Dist.*, 586 F. Supp.2d 332, 365 (W.D. Pa.2008) (citations omitted).

---

[11] Although the facts do not support the violation of a constitutional right to privacy, nonetheless a discussion with Mrs. Caruso may have violated ethical or other policy considerations on the part of Pensiero.

For a school district to be liable for monetary damages on a Title IX sexual harassment claim, a student must show: (1) quid pro quo sexual harassment, or a sexually hostile educational environment; (2) actual notice by an "appropriate person" who has the authority to take corrective measures; and, (3) a response to the harassment that amounts to deliberate indifference. *Bennett v. Pa. Hosp. Sch. of Nurse Anesthesia*, No. Civ. A. 01–CV–4098, 2002 WL 32341792,  at *3 (E.D. Pa. Oct. 29, 2002) (citing *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 291-92 (1998)).

*1. Quid pro quo*

To establish a quid pro quo sexual harassment claim, plaintiff must show (1) that she belongs to a protected group; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based on her sex; and, (4) that a tangible educational action resulted from her refusal to submission to or rejection of the sexual harassment. *See Bonenberger*, 132 F.3d at 27 (listing elements in a Title VII quid pro quo sexual harassment); *see also Gyda v. Temple Univ.*, No. Civ. A. 98-1374, 2000 WL 675722 at *6 (E.D. Pa. May, 23, 2000) (citing *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F. Supp.2 d 304, 314 (S.D.N.Y.2000)).

33

The parties do not dispute that plaintiff can establish the first three elements: as a female, plaintiff belongs to a protected class; the assault by Frank constitutes unwelcome sexual harassment;[12] and the harassment was based on her sex. The only point of contention, therefore, is whether plaintiff suffered a tangible educational action resulted from defendants' actions. Defendants maintain that plaintiff suffered no tangible educational action because of the sexual abuse. Rather, they contend any adversity she encountered in her education arose as a

---

[12]  Courts have uniformly held that sexual contact between a high school student and her teacher constitutes sexual harassment or abuse. *See, e.g.*, *Gebser*, 524 U.S. at 277-78 (presuming that a high school student's sexual relationship with her teacher, while the student was a freshman and sophomore, was "sexual harassment"); *P.H. v. Sch. Dist. of Kansas City*, 265 F.3d 653, 659 (8th Cir. 2001) (finding that the two-year sexual relationship between high school student and his teacher (court was silent on student's age or year in school) was "sexual abuse"); *King v. Conroe Ind. Sch. Dist.*, 2005 WL 1667803, at **1, 4 (S.D. Tex. July 15, 2005) (assuming that three-year sexual relationship between student and teacher, beginning when plaintiff was fourteen years old, constituted "sexual harassment"); *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp.2d 57, 62 (D. Me. 1999) ("Sexual relations between a minor student and teacher is considered sexual harassment even if the teacher does not expressly threaten to inflict a penalty ...."); see also *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 675 (1999) (Kennedy, J., joined by Rehnquist, C.J., and Scalia and Thomas, JJ., dissenting) ("A teacher's sexual overtures toward a student are always inappropriate...."). Additionally, a teacher's argument that he could not have deprived the high school student of her constitutional rights because she had consented to the sexual relationship has been rejected. *See Wilson v. Webb*, 2000 WL 1359624, at *9 (6th Cir. Sept.13, 2000) (unpublished). "A high school student who is assigned to a teacher's class does not have the capacity to welcome that teacher's physical sexual conduct." *Chancellor Pottsgrove School Dist.*, 501 F. Supp.2d 695, 708 (E.D. Pa. 2007). Thus, even if the assigned student voluntarily participates in sexual activities with the teacher, the sexual activities were unwelcome as a matter of law and therefore constitute sexual harassment.

result of her reporting the abuse. This argument is misinformed no only because it fails to recognize that reporting the assault is an extension and consequence of the assault, but also because the adversity plaintiff alleges she has suffered would not have occurred but for the assault. Moreover, a tangible action would also appear to encompasses positive actions for submitting to unwelcome sexual harassment. *See McGraw v. Wyeth Ayerst Labs., Inc.*, 1997 WL 799437, *3 (E.D. Pa. Dec. 1997) ("To make out a claim for quid pro quo sexual harassment, an employee must show that a supervisor conditioned tangible job benefits on the employee's submission to unwelcome sexual conduct or penalized [him] for refusing to engage in such conduct."). Plaintiff testified that after the assault occurred, Frank stated that he thought she was ready to get her license. Much like receiving a job benefit in a Title VII sexual harassment claim, it could be interpreted that plaintiff received an educational benefit by submitting to Frank's unwelcome advances. A reasonable fact-finder could conclude that passing her driver's licensing test and receiving a good grade in Frank's driver's education class were both conditioned on plaintiff's submission to his sexual harassment and assault. Consequently, she has put forth facts demonstrating quid pro quo sexual harassment.

35

*2. Hostile environment*

To establish a prima facie case for hostile environment harassment under Title IX, a plaintiff must demonstrate that (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; and, (4) the discrimination would have detrimentally affected a reasonable person in her position. *Bennett*, 2002 WL 32341792 at *3 (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)). *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993); *Franklin v. Gwinnett County Public Sch.*, 503 U.S. 60, 73-76 (1992) (relying on Title VII law to analyze Title IX hostile environment claims and stating that same rule should apply when a teacher sexually harasses a student as applies when a supervisor sexually harasses a subordinate under Title VII). The adverse actions must be based on sex. *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir.2002).

Defendants do not appear to dispute this element. Thus, for purposes of the present motion, it is concluded that plaintiff has produced evidence showing that the educational environment was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions

of the education and create a sexually hostile environment. Accordingly, she has satisfied this element of a prima facie case of sexual harassment under Title IX.

### 3. Actual notice to appropriate person

Plaintiff must also establish that an appropriate person had actual notice of the sexual harassment. An appropriate person "is, at a minimum an official of the recipient entity with authority to take corrective action to end the discrimination." *Gebser*, 524 U.S. at 290 (noting that Title IX's remedial scheme is predicated on an appropriate person who can take corrective measures having actual notice of violations). "The authority to supervise a teacher and to investigate a complaint of misconduct implies the authority to initiate corrective measures such as reporting [one's] findings to [one's] superior or to the appropriate school board official at the very least." *Warren ex re. Good v. Reading School Dist.*, 278 F.3d 163, 173 (3d Cir. 2002). The appropriate person must have knowledge of the misconduct yet fail to respond to it. *Bostic v. Smyrna School Dist.*, 418 F.3d 355, 362 (3d Cir. 2005); *Warren*, 278 F.3d at 173-74. While knowing of the mere possibility of harassment is not sufficient, absolute certainty that harassment has occurred is not required. *See Dawn L.*, 586 F. Supp. 2d 332 at 367 (citing *Bostic*, 418 F.3d at 360).

Defendants concede that Leitner and Volkman, as principal and superintendent, respectively, are both appropriate persons. They contend,

however, that these individuals lack actual knowledge of misconduct by Frank. As noted above, however, Leitner and Volkman both had knowledge Frank's BTW violations. Additionally, the Devore incident in 2000 put the defendants on notice of possible sexual harassment by Frank towards a student.[13] These incidents were not formally recognized as transgressions by Frank and no formal response thereto. These occurrences suggest actual knowledge by Leitner and Volkman as to misconduct by Frank. Plaintiff has, accordingly, satisfied this element.

### 4. Deliberate indifference

A school district will be found to have been deliberately indifferent if it made an official decision not to remedy the sexual harassment. *See Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. at 290. To establish deliberate indifference, plaintiff must show that defendants' response to the harassment was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648-49. In evaluating whether a school district was deliberately indifferent to known circumstances of harassment, review of its response to reported incidents of harassment is relevant. *Doe v. Bellefonte Area School Dist.*, 106 F. App'x. 798, 800 (3d Cir. 2004).

---

[13] Although defendants assert that the information concerning the Devore incident was not communicated to them, for the reasons stated above, it is arguably an issue of which certain school officials such as the superintendent and principal, should have known.

38

Defendants maintain that the district had a sexual harassment policy on which it trained employees. They further contend that they learned of plaintiff's allegations, they properly responded by notifying the police. However, Frank avoided any formal reprimand on the Devore incident or on his violations of the BTW policy for the multiple times he was observed by school officials driving with only one student.[14] This evidence could indicate that school officials were deliberately indifferent to violations of school policy by Frank or failed to formally investigate and monitor misconduct by him.

There is also evidence to suggest that school officials disbelieved plaintiff and that they pressured her to change her story. Additionally, school officials showed their support for Frank by soliciting funds for his legal defense, failed to prevent Frank from coming into contact with plaintiff, assigned Mrs. Frank as a substitute teacher to plaintiff's classes on several occasions, and displayed a picture of students showing a "FREE JF" message. Thus, despite notification to the PSP, defendants subsequent acts undermine their assertion that they took plaintiff's accusations with the proper seriousness and expected gravity accompanying such charges. Such actions suggest they were not concerned with

---

[14]  The evidence suggest, moreover, that the BTW violations were a frequent occurrence, as several people testified that Frank would take only one student out on driving lessons on a regular basis.

assessing their policies, protecting students or preventing similar misconduct in the future. It appears that they intended to treat sexual harassment claims in form but not in substance. Most importantly, these action by school officials could be interpreted by others with claims of sexual harassment as evidence that they would be disbelieved and alienated, as school officials appear occupied with supporting the accused while shunning the accuser. Plaintiff has satisfied this prong of a prima facie case for sexual harassment under Title IX.

Because it cannot be concluded that there is no genuine issue of material fact and defendants are entitled to judgment as a matter of law on this claim, it is recommended that the motion for summary judgment be denied on Count IV.

*(E) Retaliation (Count VI)*

With respect to Title IX and retaliation claims, the Supreme Court has held Title IX's private right of action encompasses claims of retaliation against an individual because he or she has complained about sex discrimination. *See Atkinson v. LaFayette College*, 460 F.3d 447, 451 (3d Cir. 2006); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005)("the text of Title IX prohibits a funding recipient from retaliating against a person who speaks out against sex discrimination, because such retaliation is intentional 'discrimination' 'on the basis of sex.'"). In allowing claims for retaliation under Title IX, the Supreme

40

Court has nonetheless neglected to provide a scheme by which they may be analyzed. *Burch v. Regents of Univ. of Cal.*, 433 F. Supp.2d 1110, 1125 (E.D. Cal. 2006) (citations omitted). Under the well-developed jurisprudence of Title VII,[15] to make out a prima facie claim for retaliation under Title IX, a plaintiff must show that (1) she engaged in protected activity; (2) the funding recipient subjected them to an adverse action after or contemporaneously with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. *Dawn L.*, *supra.*

Complaints of sexual discrimination to school authorities is a protected activity. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 523, 568 (2006). A materially adverse action is one which "well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." *Burlington*, *supra* (citations and internal quotation marks omitted). However, mere "petty slights or minor annoyances" are not, therefore, material. *Burlington*, 548 U.S. at 68. For the third prong of the prima facie case of retaliation, Plaintiffs must show that the adverse action was motivated by "retaliatory animus," *Farrell v. Planters*

---

[15]   As noted by the court in the Memorandum and Order on the motion to dismiss, Title IX jurisprudence has borrowed liberally from case law interpreting other federal anti-discrimination statutes, particularly Title VII, to explicate the contours of actionable sexual harassment. *See* Doc. 62, n. 12.

*Lifesavers Co.*, 206 F.3d 271, 281, 284 (3d Cir.2000), and that this animus had a

"determinative effect" on the complained-of decision. *Woodson v. Scott Paper*

*Co.*, 109 F.3d 913, 935 (3d Cir.1997). Factors used to demonstrate retaliatory

animus include suggestive temporal proximity and intervening antagonism. *See*

*LeBoon v. Lancaster Jewish Cmty. Ctr.*, 503 F.3d 217, 232-33 (3d Cir.2007).

If plaintiff can satisfy the elements of the prima facie case the analyses then

diverge depending upon the types of evidence available. *See Monaco v. Am. Gen'l*

*Assur. Co.*, 359 F.3d 296, 300 (3d Cir.2004). If there is direct evidence of

retaliation, defendants must demonstrate by a preponderance of the evidence "that

it would have reached the same decision" absent plaintiffs' protected conduct.

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 261 (1989) (O'Connor, J.,

concurring); *see also Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135,

146-47, 148 & n. 11 (3d Cir.2004) (citation omitted) (noting that the Third Circuit

regards Justice O'Connor's concurrence in *Price Waterhouse* as controlling and

applying *Price Waterhouse* to a claim for retaliation under the Family and Medical

Leave Act of 1993, 29 U.S.C. § 2601 et seq.); *Lackman v. Recovery Servs. of N.J.,*

*Inc.*, Civil Action No. 06-2016 (RMB), 2008 WL 583660, at *6 n. 4, 2008 U.S.

Dist. LEXIS, at *16 n. 4 (D.N.J. Feb.13, 2008) (noting that although Price

Waterhouse has been overruled by Congressional action in the context of Title

42

VII, "courts continue to use the ... analysis in ... non-Title VII discrimination cases").

Here, plaintiff alleges that she was forced to endure uncomfortable situations – a picture displayed in the principal's office in which seniors wore shirts reading "Free JF," referring to Frank; Frank's wife was being assigned as a substitute teacher to classes in which plaintiff was a student; one teacher displayed a letter soliciting funds for Frank's defense on an overhead projector in plaintiff's class; and Leitner soliciting funds for Frank's defense via the school's database and using his school issued email address directing that donations could be left with school employees.[16] As a result of these occurrences, plaintiff maintains she was forced to leave school and continue her education through homebound instruction. E.N. avers that the homebound instruction, held at a public library, was both embarrassing to her and provided a lesser quality education. Defendants concede that these events occurred but downplay the impact on plaintiff and argue that they were sensitive to the situation and accommodated her in any way they could.

---

[16]  Defendants maintain that Leitner was not reprimanded for this occurrence inasmuch as the solicitation occurred after he left the employ of the school district, during a time period where he still had access to his email account and the school district database.

Based on the severity of the charges against Frank, such actions by school officials would likely deter a student of ordinary firmness from notifying school officials of claims of sexual harassment and assault. This is made even more true when considering the subject was a high school student, a time period in life where one is especially susceptible to peer influence and may not be well-equipped to handle ostracism from one's peer group. While defendants go to lengths to point out the free speech rights of those supporting Frank and that plaintiff elected homebound instruction, nonetheless the mark of the school district endorsing such sentiments is quite clear. Displaying the picture with a "Free JF" message in a school office and letters by a school official appealing for donations to support Frank's legal defense of the claims against him clearly evidence that the school district supported Frank, not E.N. The assignment of Mrs. Frank as a substitute teacher to E.N.'s classes, even if unintended, suggests a lack of sensitivity or tact towards plaintiff. Moreover, although they aver that plaintiff elected to pursue homebound instruction, the voluntariness of the decision is doubtful. It appears, rather, that she was compelled to make this decision to receive homebound instruction rather than remain at school, subjected to the

constant barrage of assaultive behavior directed towards her through the

demonstrative support of Frank.[17]

Plaintiff has, therefore, satisfied her burned of establishing a prima facie

case of retaliation by demonstrating that she engaged in protected activity, that she

was subject to adverse action after reporting the assault to school officials, and

that a causal link exist between the two. The defendants, however, have not

proffered whether they would have acted taken the same action but for plaintiff's

claims against Frank, as with direct evidence of retaliation, or whether they had a

legitimate non-discriminatory reason for actions as is required for circumstantial

evidence of retaliation. Consequently, they have not met their burden on the

retaliation claim. Inasmuch as there are genuine issues of material fact present, it is

recommended that summary judgment be denied on this claim.

*(F) Punitive Damages (Count XI)*

In Pennsylvania, "'[p]unitive damages may be awarded for conduct that is

outrageous, because of the defendant's evil motive or his reckless indifference to

the rights of others.'" *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770

---

[17]   It thus appears that, regardless of quality of the homebound instruction, the actions of
which she complains may themselves state a claim for retaliation. Nonetheless, given that
so much of one's educational development is the social and interactive process, especially
in high school, learning away from that environment cannot equate the same high school
experience.

45

(2005) (quoting *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742, 747 (1984)). Since

"punitive damages are penal in nature," they are available "only in cases where the

defendant's actions are so outrageous as to demonstrate willful, wanton or reckless

conduct." Id. In determining whether to award punitive damages, "one must look

to 'the act itself together with all the circumstances including the motive of the

wrongdoers and the relations between the parties.'" *Feld*, 485 A.2d at 748.

However, having concluded that the majority of Plaintiff's claims should survive

summary judgment and proceed to trial, this claim, likewise, should be decided by

the trier of fact. Consequently, it is recommended that the motion for summary

judgment be denied on Count XI, Punitive Damages.

**IV. Recommendation**

Based on the foregoing, it is respectfully recommended that the motion for

summary judgment be granted as to Count III (§1983 – Right to Privacy), and that

the motion be denied in all other respects.

Signed on July 5, 2011.

_____
MILDRED E. METHVIN
U. S. MAGISTRATE JUDGE